[No. G006819. Fourth Dist., Div. Three. Mar. 28, 1990.]

FRANKLIN ROBERT SESLER, Plaintiff and Respondent, v. INDERBIR GHUMMAN et al., Defendants and Appellants.

COUNSEL

Hill, Genson, Even, Crandall & Wade, Horvitz & Levy, David M. Axelrad and Mitchell C. Tilner for Defendants and Appellants.

Ingram & Truett, Robert B. Ingram, Harold J. Truett III and Richard V. McMillan for Plaintiff and Respondent.

OPINION

TAYLOR, J.*—Does the trial judge have a duty to specially instruct the jury, other than in the words of Vehicle Code section 21801[1] and BAJI No. 5.21, on the duty of a left-turning driver where, as here, some but not all of the oncoming vehicles have yielded the right-of-way? We hold, under the circumstances of this case, he does.

I

This is an action for negligence arising out of a traffic accident that occurred on August 15, 1983, at the intersection of Euclid Avenue and Sixteenth Street in Santa Ana, California. There were no traffic signals or

---
* Assigned by the Chairperson of the Judicial Council.
[1] All statutory references are to the Vehicle Code.

stop signs regulating traffic at the intersection, and the weather was clear. The intersection of Euclid Avenue and Sixteenth Street is a "T" intersection, with Sixteenth Street terminating its west end at Euclid. Euclid Avenue is a major north-south arterial highway. The posted speed limit for traffic northbound on Euclid was 40 miles per hour. In the immediate vicinity of the accident, Euclid consisted of two southbound lanes plus a left-turn lane, and three northbound lanes.

Plaintiff and respondent Franklin Robert Sesler had proceeded southbound on Euclid, on his motorcycle, intending to turn left on Sixteenth. Defendant and appellant Inderbir Ghumman[2] was northbound in his car on Euclid. Sesler was turning left on his motorcycle when he was struck by Ghumman's oncoming car.

Prior to impact, as Sesler approached the intersection, he proceeded into the left turn pocket, stopped, and waited for traffic on north-bound Euclid to clear. The left turn would require that he cross three lanes of northbound traffic.[3] Northbound traffic came to a stop, leaving a gap in traffic through which Sesler could turn. Approximately five cars stopped in each of northbound lanes 1 and 2. There were no vehicles in northbound lane 3. The drivers in lanes 1 and 2 northbound motioned for Sesler to proceed with his left turn in front of them. According to the undisputed testimony, Sesler looked at lane number 3, and did not, *nor could he,* see any hazard.[4] Sesler commenced his left turn.

At about the same time, Ghumman was traveling northbound on Euclid in lane 1 within the posted 40 miles per hour speed limit. As he approached the intersection of Sixteenth Street, he saw the lines of cars stopped in lanes 1 and 2 ahead of him (south of the intersection). He moved into the number 3 lane which was clear of traffic, and proceeded ahead. Ghumman could not see the southbound left-turn lane at Sixteenth Street, nor what, if anything, was in front of the northbound cars stopped in lanes 1 and 2.

When Sesler started his left turn, he accelerated from a stopped position to five-ten miles per hour during the turn. He could not recall looking to his right for oncoming traffic during the turn.[5] He crossed in front of lanes 1

---

[2] Ghumman's parents, Rajinder and Suvinder Ghumman, are also named defendants. Their liability derives from a stipulation that Inderbir had been on an errand for the family business at the time of the accident. They join in this appeal.

[3] For this discussion we number the lanes as follows: lane 1 is the lane closest to center; lane 2 is the middle lane; lane 3 is the lane closest to the curb.

[4] This is conceded in Sesler's brief. The implication is clear. At the time Sesler turned, his vision of the northbound lanes was almost certainly blocked by the vehicles stopped in lanes 1 and 2. He made the left turn nonetheless.

[5] In deposition testimony, when asked if he looked to his right for northbound traffic at any time during the turning movement, Sesler testified, "I can't remember." However, at trial, he

and 2 and proceeded into lane 3, into the path of Ghumman's oncoming car, without stopping.

Ghumman saw the motorcycle appear in front of him a split second before impact, and braked, leaving 25 feet of skid marks prior to the collision. Ghumman's car struck Sesler's motorcycle. Sesler was knocked off his motorcycle, across the hood of Ghumman's car, causing Sesler's head to strike the windshield, resulting in serious injuries to Sesler.[6]

Sesler goes to great pains in his brief to establish, by interrelation of speeds, time and distance, that he was into the intersection in the process of his turn at the time Ghumman was changing from lane 1 to lane 3 northbound. While this "fact" is far from certain under the evidence, we shall assume it to be true for purposes of this appeal.[7]

The court instructed the jury on the duty of a left-turning motorist in the words of section 21801, as it existed at the time of trial: "(a) The driver of a vehicle intending to turn to the left at an intersection . . . shall yield the right-of-way to all vehicles which have approached or are approaching from the opposite direction and which are so close as to constitute a hazard at any time during the turning movement and shall continue to yield the right-of-way to such approaching vehicles until such time as the left turn can be made with reasonable safety. [¶] (b) A driver having so yielded and having given a signal when and as required by this code may turn left and the drivers of all other vehicles approaching from the opposite direction shall yield the right-of-way."

Vigorously advocating Sesler's contributory negligence throughout the trial, Ghumman proposed a tailored jury instruction, specifically instructing the jury on the duty of a left-turning vehicle when an oncoming vehicle has yielded the right-of-way. Designated defense instruction No. 6, it reads: "If an oncoming vehicle in the lane closest to the left-turning vehicle surrenders its right-of-way by indicating to the operator of the left-turning vehicle that it desires him to proceed, such operator may not proceed beyond the first lane of traffic, now effectively blocked by the waiving vehicle, if in fact other vehicles approaching in any of the other oncoming lanes will constitute a hazard to the left-turning vehicle during the turning movement." The court refused this instruction, finding that it was covered by BAJI No. 5.21. The

---

testified he looked over (above) the cars stopped in lane 2, and saw nothing. We must adopt the facts in the light most favorable to Ghumman in determining whether the facts support his requested instruction.

[6] Sesler was not wearing a helmet, although his usual practice was to do so.

[7] Estimates of Ghumman's speed varied from 25 to 38 miles per hour. The posted speed on Euclid was 40 miles per hour.

court expressed a similar view in denying Ghumman's motion for a new trial.

## II

A party has a right to jury instructions on his or her theory of the case, if they are reasonable and supported by the pleadings and the evidence, or any inference which may properly be drawn from the evidence. (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 240, p. 246; *Anderson* v. *Latimer* (1985) 166 Cal.App.3d 667, 674 [212 Cal.Rptr. 544].) This right is designed to ensure the jury has "a full and complete understanding of the law applicable to the facts" of the case before it. (*Bartosh* v. *Banning* (1967) 251 Cal.App.2d 378, 387 [59 Cal.Rptr. 382]; *Distefano* v. *Hall* (1963) 218 Cal.App.2d 657, 672 [32 Cal.Rptr. 770].) In deciding whether the trial court erred in refusing a requested instruction, the evidence must be viewed in the light most favorable to the party seeking it. (See *Anderson* v. *Latimer, supra,* 166 Cal.App.3d at p. 674; *Alvarez* v. *Felker Mfg. Co.* (1964) 230 Cal.App.2d 987, 998 [41 Cal.Rptr. 514].)

Appellant's proposed instruction No. 6, quoted above, was grounded squarely on the case of *In re Kirk* (1962) 202 Cal.App.2d 288 [20 Cal.Rptr. 787]. In that case, Kirk, driving eastbound, intended to turn left across two westbound lanes. At the intersection, a driver in westbound lane 1 (lane closest to the center) stopped and motioned to Kirk to turn left in front of him. A driver in lane 2 westbound was unable to see the left-turning Kirk vehicle, as it was hidden from his view by the vehicle to his left which had stopped. By the time he saw the Kirk vehicle cross into his (No. 2) lane, he was too close to stop, and struck the Kirk vehicle. Thus, Kirk is factually on all fours with the case at bench.

In its analysis of section 21801, subdivision (a), the *Kirk* court noted that in 1957 the Legislature added the phrase "at any time during the turning movement." (202 Cal.App.2d at p. 291.) Thus, continued the court, "we reason that if the oncoming vehicle in the lane closest to the left turning vehicle surrenders its right of way by indicating to the operator of the left turning vehicle that it desires him to proceed, such operator may not proceed beyond that first lane of traffic, now effectively blocked by the waiving vehicle, if in fact other vehicles approaching in any of the other oncoming lanes will constitute a hazard to the left turning vehicle during the turning movement." (*Ibid.*)

Applying these considerations, the *Kirk* court reasoned, "[W]hen Karen was given the 'go ahead signal' by the driver in the first lane *she still had the obligation to ascertain before proceeding into the next lane if any vehicle . . .*

*approaching* from the opposite direction was so close as to constitute a hazard at any time during her turning movement." (202 Cal.App.2d at p. 292, italics added; see also *Dawson* v. *Williams* (1954) 127 Cal.App.2d 38, 43 [273 P.2d 75].)

Sesler seeks to distinguish *Kirk* factually. He fails to do so. There are always minor factual differences between cases. The minor factual differences here are trivial, and do not affect the principles involved.

Amazingly, in the face of the *Kirk* opinion, Sesler's counsel argued to the trial court, and now argues to us: "[n]either Vehicle Code section 21801 nor *In re: Kirk* [*sic*], *supra*, requires an individual making a left-turn to stop or pause at each lane of traffic and look to see if that lane is clear before crossing that lane." And further that: "The true emphasis of *Kirk, supra*, and all other left-turn cases, is upon whether, at the time the left turning driver is making *the decision to turn,* that driver ascertains that there are no oncoming vehicle [*sic*] which are so close as to constitute a hazard."

These arguments are untenable. ■ While a motorist may waive his or her own right-of-way, neither the law nor common sense dictates that the waiver applies to any other motorist. To follow Sesler's argument to its logical conclusion would require any oncoming driver to stop at an intersection for the sole reason that vehicles in lanes to his left were stopped *for any reason.* Such an argument was rejected out of hand in *Powell* v. *Bartmess* (1956) 139 Cal.App.2d 394, 403 [294 P.2d 150]. This is not to say, of course, that the maneuver of overtaking and passing on the right can be done with impunity—it may be done "only under conditions permitting such movement in safety." (§ 21755.)[8] But, this does not affect or diminish the duty of the left-turning driver crossing in front of stopped vehicles into an open lane.

The *Kirk* case has stood as good law in this state for over two decades.[9] We see no reason in law or logic to modify its holding. The weakness of Sesler's position is exposed by the fact he is unable to cite us one case or authority—in this state or any other—to support it. We hold section 21802, subdivision (a), requires that where, as here, some, but not all, of the oncoming vehicles have yielded their right-of-way to a left-turning driver,

---

[8] The jury was so instructed.

[9] Sesler's counsel misrepresented to the trial judge, as he does to us, that the court in *Donnelly* v. *Peterson* (1968) 265 Cal.App.2d 717 [71 Cal.Rptr. 659] disapproved the *Kirk* instruction. It did no such thing as relevant to the case before us. *Donnelly* did not remotely address the duty of a left-turning driver when some, but not all, oncoming motorists yield their right-of-way.

that driver has a continuing duty during the turning movement to ascertain, before proceeding across the next open lane(s), if any vehicle is approaching from the opposite direction so close as to constitute a *hazard.*

 The trial judge refused Ghumman's instruction No. 6 on the basis it was covered by BAJI No. 5.21 (7th ed. 1986). As read to the jury, No. 5.21 stated: "A vehicle is so close as to constitute a hazard to another vehicle headed in the opposite direction and intending to turn left at an intersection whenever a reasonable person in the position of the driver intending to turn left would realize that the two vehicles would probably collide at some time during the turning movement if he did not yield the right of way."

Manifestly, the function of this instruction is to define and clarify the phrase "so close as to constitute a hazard" as used in section 21801, subdivision (a). It simply does not address the duty of a left-turning driver when some of the oncoming motorists have yielded the right-of-way. While it may be true, as counsel points out, the comment to BAJI No. 5.21 cites *Kirk* for the proposition that the "[D]uty of left turning vehicle to yield right of way applies to all approaching vehicles which will constitute a hazard even if one such vehicle has yielded its right-of-way . . ." the instruction itself does not state that proposition in any form. The *Kirk* rule is not covered by BAJI No. 5.21.

Is it covered by section 21801, subdivisions (a) and (b), which were read to the jury verbatim, as Sesler urges? Section 21801 recites in general terms the duty of a left-turning driver under *ordinary* circumstances. Ghumman's proposed instruction No. 6 correctly defined this duty in the context of the particular facts before this jury, in which some, but not all, of the oncoming vehicles had yielded to the left-turning driver.

 Because many general jury instructions are inadequate, Courts of Appeal have consistently held, "A trial court should not require a party to rely on abstract generalities in presenting its legal theory of the case to the jury, but should instruct the jury on vital issues in terms that relate to the particular case before it. (*Borenkraut* v. *Whitten* [1961] 56 Cal.2d 538, 545-546 [15 Cal.Rptr. 635, 364 P.2d 467]; *Menchaca* v. *Helms Bakeries, Inc.* [1968] 68 Cal.2d 535, 542 [67 Cal.Rptr. 775, 439 P.2d 903].)" (*Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 10 [116 Cal.Rptr. 575].) Therefore, giving an instruction embodying a general rule does not justify refusing a more specific instruction applying the rule to the particular circumstances of the case. (See *Hildebrand* v. *Los Angeles Junction Ry. Co.* (1960) 53 Cal.2d 826, 831 [3 Cal.Rptr. 313, 350 P.2d 65].) As

Ghumman's proposed instruction No. 6 specifically related the law in terms applicable to this particular case, the court's refusal to give it was error.

The next question presented is whether this error was prejudicial. (See Cal. Const., art. VI, § 13.) ■ In assessing the effect of instructional error, a factor we consider is whether opposing counsel's argument to the jury magnified it. (See *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].) ■ Here, the court's refusal to give the *Kirk* instruction allowed Sesler's counsel the leeway he sought to explain his version of section 21801, and how it applied to the facts. In final argument he stated: "But also you have to remember that Frank [Sesler] had already made his left turn, he's in the intersection, he's using the intersection. [¶] So, from the same thing, I believe the law doesn't place a duty on Frank to anticipate that the other person will not yield the right of way to somebody already using an intersection. It comes right out of the Vehicle Code. . . . [¶] You'll be instructed on 21801 of the Vehicle Code. Okay? Now, what does that mean? Well, basically it talks about making left turns. It's got two parts to it. Quite frankly, we're going to be talking about the second part. That is once you start making a turn then that's your intersection . . . . [¶] This is the law that his honor will give you, and the drivers of all other vehicles approaching from the opposite direction shall yield the right of way."

Counsel's argument is contrary to law. Proposed instruction No. 6, embodying the *Kirk* holding, would certainly have prevented counsel from advocating his erroneous interpretation of section 21801. The defense instruction would have informed the jury that even after Sesler acquired the right-of-way across lanes 1 and 2, he nevertheless still had the duty during his turn to ascertain if it was safe to do so before proceeding across lane 3 (that is, he had the duty to yield the right-of-way to approaching vehicles in that lane).[10] Though Ghumman's counsel was also allowed to argue the correct rule to the jury, the jury had two diametrically opposed statements of the "law" before it, without clarification from the court.

Understandably confused as to a vital legal issue and, after deliberating for several days, the jury submitted the following question to the court: "Does a left turning vehicle have the right-of-way to the entire intersection or to one lane at a time?" In response, the court evidently simply reread section 21801,[11] and continued to refuse to give Ghumman's proposed

[10] Evidence was presented that, had Sesler paused for just one second before crossing into lane 3, the accident would have been avoided.

[11] The record does not disclose the court's exact response. The clerk notified counsel the court intended to reread section 21801 to the jury. It is undisputed the court continued to refuse Ghumman's proposed instruction.

instruction No. 6, even though it would have answered the precise question posed by the jury foreman.

■ Where original instructions are inadequate, and the jury asks questions indicating their confusion and need for further explanation, failure to give proper additional instructions is usually reversible error. (7 Witkin, Cal. Procedure, *supra,* Trial, § 305, p. 303.) The trial judge's duty to adequately instruct the jury "becomes particularly acute when the jury asks specific guidance." (*Bartosh* v. *Banning, supra*, 251 Cal.App.2d at p. 387.)

In *Bartosh,* plaintiff sued for personal injuries sustained as a result of a fight between two defendants. In the course of its deliberations, the jury returned with the following questions: "One, is proof of negligence determined only by proof of who started the fight? Two, if by prudent action he could avoid the fight and did not, was he negligent?" (251 Cal.App.2d at p. 387.) In response thereto, the trial court simply reread several standard instructions bearing on negligence and contributory negligence, thereby failing to answer the jury's specific questions.

In reversing for failing to clarify the applicable law, the Court of Appeal stated: "We believe the jury's questions, posed to the court after some deliberation, indicated their confusion on these issues presented to them for determination and constituted a request to the trial court for specific guidance as to such issues. . . . [T]he trial court's failure after such request to specifically guide the jury with appropriate jury instructions on these issues resulted in reversible error." (251 Cal.App.2d at p. 388.) And this reversal resulted even though trial counsel *agreed* the general instructions given adequately covered the jury's specific questions, and neither side offered further instructions on the duty of a mutual combatant as to an innocent bystander.

■ Far more compelling is the case at bench where, from the time jury instructions were first discussed between the court and counsel, Ghumman's attorney vigorously argued his proposed instruction No. 6 was critical to the defense, and repeatedly requested it be given.

Ghumman's instruction No. 6 correctly embodied the *Kirk* rule. It was supported by the evidence and correctly stated the law. The trial judge never ruled otherwise, refusing to give it solely on the ground it was covered by other instructions. In this, the trial court erred. The *Kirk* rule was never put before this jury, thus leaving it without legal guidance as to Sesler's contributory negligence. The error was prejudicial by any measure, and compels reversal.

The reversal being required, it is unnecessary to discuss Ghumman's other contentions of error occurring at trial.

The judgment is reversed, with costs on appeal awarded to appellant.

Wallin, Acting P. J., and Sonenshine, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 20, 1990.